## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| A. MARGARET CARRANZA *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 05-0117  (RMU) |
| | : | | |
| v. | : | Re Document No.: | 43 |
| | : | | |
| PHILLIP FRAAS, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This matter is before the court on the defendant's motion for summary judgment.  The plaintiffs in this case are two female farmers who hired the defendant, attorney Phillip Fraas, to represent them in a civil rights action against the United States Department of Agriculture ("USDA").  After settlement negotiations with the USDA ultimately failed, the plaintiffs commenced this action against Fraas for legal malpractice and breach of fiduciary duty, claiming that the defendant failed to exercise reasonable skill, care and diligence while representing them in their civil rights action.  Because the defendant has demonstrated that there is no genuine dispute of material fact and that he is entitled to judgment as a matter of law, the court grants the defendant's motion.

## II.  FACTUAL & PROCEDURAL BACKGROUND

### A.  Factual Background

The plaintiffs, A. Margaret and Juanita Carranza, are female farmers who reside in Richland County, Montana.  Compl. ¶ 3.  In January 1998, they filed a lawsuit against the

USDA, alleging that the USDA's Farm Service Agency ("FSA") had exhibited a pattern of gender discrimination in its loan practices.  Pls.' Opp'n to Def.'s 2d Renewed Mot. for Summ. J. ("Pls.' Opp'n") at 2; Def.'s Stmt. of Material Facts not in Dispute ("Def.'s Stmt.") ¶ 1.  The plaintiffs retained the defendant to legally represent them in their suit.  Def.'s Stmt. of Material Facts not in Dispute ("Def.'s Stmt.") ¶ 1.  At the same time, the plaintiffs owed a substantial debt to the FSA.  *Id.* ¶ 2.

In December 1998, the Director of the USDA's Office of Civil Rights ("OCR"), Ms. Rosalind Gray, extended a settlement offer ("1998 Offer") to the plaintiffs that would resolve their lawsuit.  Def.'s 2d Renewed Mot. for Summ. J. ("Def.'s Mot."), Ex. 4.  The 1998 Offer would have forgiven the plaintiffs' outstanding debt to the FSA (then valued at $546,915.84), offered $98,000 in compensatory damages and allowed the plaintiffs to participate in future USDA programs.  *Id.*  The plaintiffs deemed the offer to be insufficient.  *Id.*  The plaintiffs therefore responded to Ms. Gray in February 1999 with a counteroffer that sought significantly higher compensatory damages.[1]  Def.'s Mot., Ex. 5.

By January 2001, the Carranzas' outstanding debt to the USDA had been converted into a substantial money judgment against them that was owed to the U.S. Attorney's Office for the District of Montana ("USAO Montana").  Def.'s Mot., Ex. 9.  Including accumulated interest, the value of the judgment neared $700,000.[2]  *See* Def.'s Mot., Ex. 9; Pls.' Opp'n, Ex. 22.  This

---

[1]     In contrast to Ms. Gray's offer of $98,000 total compensatory damages, the counteroffer specified compensatory damages of $500,000 for lost income, $55,000 for a herd of Targhee sheep, and $65,000 for lost equipment.  Def.'s Mot., Ex. 5.  The counteroffer also sought compensation for the loss of two farms, dislocation costs, the emotional and mental distress caused by the USDA's discrimination and attorney's fees.  *Id.*  The counteroffer did not assign a precise value to those damages.  *See id.*

[2]     In a letter to Senator Baucus, the defendant states that the judgment "amounts to $558,000, plus interest since 1998."  Def.'s Mot., Ex. 9.  In his phone log for January 9, 2001, the defendant noted, "The judgment is too high – around [$]700k."  Pls.' Opp'n, Ex. 22.

conversion of the debt to a judgment significantly altered the settlement options that the OCR was willing or able to consider.  *See id.*; Def.'s Mot. Ex. 9.  Previously, the OCR could have simply written off the plaintiffs' debt to the USDA and paid compensatory damages, as it had offered to do in 1998.  Def.'s Mot. Ex. 9.  Once the debt had been converted to a money judgment, however, the OCR was faced with sticker shock: it would have been forced to write a significantly larger check (by a margin of $700,000) in order to cover both compensatory damages and the value of the judgment.  *Id.*

Although the OCR was apparently receptive to this idea, the USDA's Office of General Counsel ("OGC"), whose approval was required in order to settle, was not.  *Id.*  The defendant's handwritten notes from a January 9, 2001, phone conversation with Ms. Gray allude to this fact: "[Gray] wanted to offer 1.2M – told she only has $300k."  Pls.' Opp'n Ex. 22.  The OGC balked at taking this approach because it would have resulted in an unprecedented payout from the informal claims process.  *See id.*

Caught between the USDA and the USAO Montana, on January 9, 2001, the defendant asked Senator Baucus's office to help negotiate a compromise with the USAO Montana and the USDA.  *Id.*  The defendant hoped to reach a deal before the Bush administration assumed control later that month, but the talks were unsuccessful.  *Id.*

On January 18, 2001, Ms. Gray also sent a letter to the parties that confirmed that the OCR was unable to make an acceptable offer to the plaintiffs and offered them advice regarding possible next steps.  Pls.' Opp'n, Ex. 24.  On January 23, 2001, the defendant sent a memorandum to the Carranzas' congressional representatives,[3] describing how the settlement talks had come to an impasse: "those efforts did not pan out in the seven days left in Gray's

---

[3]          Senators Baucus (D-MT), Senator Burns (R-MT) and Congressman Rehberg (R-MT).

tenure, so a settlement offer was not made." Def.'s Mot., Ex. 11. In the same memorandum, the

defendant alluded to an offer "drawn up (but not actually made) by Gray" that might have proven

workable had it been possible to dispose of the USAO Montana's judgment against the plaintiffs.

Def.'s Mot., Ex. 11. Ultimately, as the defendant indicates, the size of the judgment inhibited

any progress and eventually stymied any deal. *Id.*

The defendant subsequently indicated that he was making efforts to resume settlement

negotiations with the "new folks at OCR" (that is to say, OCR employees under the leadership of

the newly elected Bush administration). *Id.* At the plaintiffs' behest, the defendant sent a letter

in February 2001 to Scot Brown, an Agricultural Loan Officer at the McCone County Federal

Credit Union in Montana, advising him of the current status of the plaintiffs' claims. Def.'s

Mot., Ex. 14. This letter reiterates that, while the defendant had been continuing negotiations as

the OCR had transitioned from the Clinton to the Bush Administration, no offer had been made.

*Id.*

Another piece of correspondence dated March 2001 indicates that the talks fell short. A

series of letters between Keith Luse, Staff Director for the Senate Committee on Agriculture, and

the parties explain that while Ms. Gray had hoped to make the Carranzas an offer, the value of

the judgment against the Carranzas would have eclipsed any offer she was authorized to make.

Pls.' Opp'n, Ex. 27. Accordingly, the March 2001 letter explained that the defendant had

informed Ms. Gray that any such offer would be unacceptable to his clients (the plaintiffs), and

that she therefore need not bother formally putting such an offer on the table. *Id.*

In January 2002, plaintiff Juanita Carranza traveled to Washington, D.C. to testify at trial

for Sharon Mavity, an individual who had levied discrimination claims against the USDA that

were similar to the claim brought by the plaintiffs. Pls.' Opp'n, Ex. 1 ("Carranza Aff.") ¶ 7. At

one point during the proceedings, plaintiff Juanita Carranza, Ms. Gray, Mr. Garsjo and Betty Pucket, another witness, were placed together in a witness room.[4]  *Id.* ¶ 8; *Id.*, Ex. 30 ("Garsjo Aff.") ¶ 5; Def.'s Mot., Ex. 15 ("Gray Aff.") ¶¶ 11-15.  During this time, the plaintiffs allege that Ms. Gray, who had since left her position as Director of the OCR at the USDA, revealed that, in addition to the 1998 Offer, she had extended a second, significantly greater, settlement offer to the Carranzas in January 2001 ("2001 Alleged Offer").[5]  Because this allegation is central to the present motion, it is worth quoting in full:

> [Ms. Gray] said the Montana cases were signed off to be debt settled but Fraas would not respond with the needed paperwork.  She said that our case settlement would have been the highest settlement ever to come out of the Office of Civil Rights[.] She signed off on it, the Office of General Counsel signed off on it, but Fraas dropped the ball.  Dennis [Garsjo] asked [Ms. Gray] if $780,000 was the highest settlement ever offered as these were the figures he'd calculated for the Carranza damages.  Ms. Gray grinned and shook her head no.  I asked her if $1,800,000 was the amount as Mr. Fraas had said this was the amount of total damages to me.  (Although we never got the final proposal from Mr. Fraas to Gray until we received the Fraas Records).  Ms. Gray nodded her head yes.  Not only was Dennis in shock, but so was I as Phillip Fraas had never mentioned any amount over the Judgment to me or my mother.  He'd always said the Judgment would have eaten up the settlement proposal in all of his letters to the Congressional delegation and to me.  [Ms. Gray] also referred [to] the Deficiency Judgment that I'd been told by Mr. Fraas that stopped the settlement, Gray said: "that was just something cooked up between Mr. Fraas and [Assistant U.S. Attorney for the District of Montana] Victoria Francis.  We discussed many other topics relating to USDA civil rights in a friendly way just as a way to pass the long hours in the witness room.

---

[4]   There seems to be some confusion as to whether or not Ronald Cotton, then a representative of the USDA Coalition of Minority Employees, was present in the room, as well.  *Compare* Def.'s Mem. Ex. 16, Cotton Aff. ¶¶ 1, 6-8; Def.'s Mem. Ex. 15, Gray Aff. ¶¶ 14-17; Pls.' Opp'n Ex. 30, Garsjo Aff. ¶¶ 6-8; *with* Carranza Aff. ¶ 8.  This issue is not material, however, and it does not alter the court's analysis.

[5]   At different times, the plaintiff appears to allege that this offer was either for $1.2 million, *see, e.g.*, Pls.' Opp'n at 14, 23, 27; Carranza Aff. ¶ 11, or for $1.8 million, *see, e.g.*, Pls.' Opp'n at 11; Carranza Aff. ¶ 8.

Carranza Aff. ¶ 8.  The plaintiffs thus allege that the defendant never informed them of this second offer, and that as a result of his failure to do so, they were unable to accept the offer.  *Id.* ¶¶ 8, 11.  On January 29, 2002, the plaintiffs terminated their attorney-client relationship with the defendant.  Def.'s Mot., Ex. 12.

## B.  Procedural History[6]

In January 2005, the plaintiffs brought suit against the defendant, alleging legal malpractice and breach of fiduciary duty.  *See generally* Compl.  The defendant filed a motion for summary judgment in March 2009.  *See generally* Def.'s Renewed Mot. for Summ. J.  This court granted in part and held in abeyance in part the defendant's motion.  *See generally* Mem. Op. (Feb. 7, 2011).  The court granted summary judgment to the defendant on various claims, including the plaintiff's allegations that the defendant failed to meet certain deadlines and that the defendant harbored a conflict of interest.  *Id.* at 13-16.

The court did not grant summary judgment on the plaintiffs' third and final legal malpractice claim – that the defendant allegedly breached his duty to inform them of a settlement offer in 2001.  *Id.*  Although the court observed that the "paucity of evidence in the record" raised "serious questions about the viability of this claim," the court denied the defendant's motion for summary judgment without prejudice.  *Id.* at 20.  In April 2011, the defendant filed a renewed motion for summary judgment under Federal Rule of Civil Procedure 56 on the plaintiff's last remaining claim.  *See generally* Def.'s Mot.  With that motion ripe for adjudication, the court turns now to the applicable legal standards and the parties' arguments.

---

[6]     A more detailed procedural history is provided in this court's February 7, 2011 Memorandum Opinion.

## III.  ANALYSIS

### A.  Legal Standard for Summary Judgment

Summary judgment is appropriate when the pleadings and evidence show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine dispute" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252.  To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

The nonmoving party may defeat summary judgment through factual representations made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record," *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338

(D.C. Cir. 2006).  Indeed, for the court to accept anything less "would defeat the central purpose

of the summary judgment device, which is to weed out those cases insufficiently meritorious to

warrant the expense of a jury trial."  *Greene*, 164 F.3d at 675.

### B.   The Court Grants the Defendant's Motion for Summary Judgment

The parties' dispute hinges on one factual issue: whether or not the USDA extended a

settlement offer in January 2001 to the plaintiffs.  In their complaint, the plaintiffs argue both

that the USDA had made such an offer and that the defendant committed legal malpractice by

failing to inform them of that offer.  Compl. ¶ 8.  In response, the defendant contends that the

USDA never made such an offer.  Def.'s Mot. at 1.  Accordingly, the defendant argues that he

cannot be held liable for failing to inform the plaintiffs of an offer that never existed.  *See id.*,

Exs. 9-11, 15-16.  In their opposition, the plaintiffs contend that the record shows that the USDA

made a firm settlement offer (of either $1.2 or $1.8 million) in January 2001, and that the

defendant committed legal malpractice by failing to relay it to the plaintiffs.  Pls.' Opp'n at 19.

In order to establish a prima facie case of legal malpractice, the plaintiff must

demonstrate (1) the applicable standard of care, (2) a violation of that standard and (3) a legally

cognizable injury as a result of such violation.  *See Kaempe v. Myers*, 367 F.3d 958, 966 (D.C.

Cir. 2004).  It is uncontested that an attorney has a duty to inform his client of meaningful

settlement offers made in the course of civil litigation.  *See, e.g.*, D.C. RULES OF PROF'L

CONDUCT R. 1.4(a) cmt. 1 ("A lawyer who receives from opposing counsel an offer of settlement

in a civil controversy . . . is required to inform the client promptly of its substance."); *Sommers v.

McKinney*, 670 A.2d 99, 104 (N.J. App. Super. 1996) ("Once settlement discussions

commenced, [the attorney] was obliged to communicate all offers to [the client]."); *Rizzo v.

Haines*, 555 A.2d 58, 66 (Pa. 1989) ("Consistent with ordinary skill and knowledge, it was

incumbent upon [the attorney], as a matter of law, to communicate all settlement offers to his client."). The duty to inform clients of all settlement offers "derives from the settled principle that an attorney must have express authority from the client to settle the case." *Rizzo*, 555 A.2d at 66 (internal citations omitted).

In the present case, none of the parties contest the fact that the defendant had a duty to inform the plaintiffs of any settlement offers that might have been put forward by the USDA. *See generally* Def.'s Mot; Pls.' Opp'n. Instead, the plaintiffs appear to posit two independent factual theories: (1) the defendant's notes from his January 9, 2001, phone call with Ms. Gray allegedly prove that a $1.2 million settlement offer was made, *see* Pls.' Opp'n at 14; Carranza Aff. ¶ 11, and (2) plaintiff Juanita Carranza's own affidavit allegedly proves that a $1.8 million settlement offer was extended, *see* Carranza Aff. ¶ 8. The court discusses each theory below.

### 1. A Reasonable Juror Could Not Determine that the OCR Ever Made a $1.2 Million Settlement Offer

The plaintiffs allege that the USDA made them a $1.2 million offer in January 2001. Pls.' Opp'n at 14. The plaintiffs rest their assertion on one piece of evidence: a single entry in the defendant's phone log from January 9, 2001. *Id.* The entry reads as follows: "Talked to R[osalind] G[ray] again. Have to move case off her desk by 1-20,[7] period. Wanted to offer 1.2M – told she only has 300k." Pls.' Opp'n, Ex. 22. In their opposition, the plaintiffs construe the final phrase to signify that Ms. Gray actually extended a firm $1.2 million offer at this point. *See* Pls.' Opp'n at 14, 23, 27; Carranza Aff. ¶ 11. The words "Wanted to offer 1.2M," however, plainly do not support such a contention. Rather, the entry indicates the very opposite: that Ms. Gray never made any offer because she lacked sufficient settlement authority from the OGC.

---

[7]     This refers to January 20, 2001 – the date of President George W. Bush's inauguration, at which point the USDA (and therefore the OCR) would fall under new leadership.

The defendant's contemporaneous memorandum to Senator Baucus explicitly supports the same conclusion; in relevant part, it states as follows:

> Rosalind Gray, the Director of USDA's [OCR,] recently developed a proposal to settle the Carranzas' civil rights that, in general terms, would have been acceptable to the Carranzas.  However, officials at the [Office of General Counsel] have argued that the settlement amount contemplated by OCR was too high, and thus severely limited Gray's settlement authority."

Def.'s Mot., Ex. 9.

Although the plaintiffs contend that the defendant's January 9, 2001, phone log entry proves that the USDA made them a $1.2 million offer, upon examination of this entry it is clear that the evidence does not support the plaintiffs' contention.  Accordingly, the court concludes that no reasonable jury could find a genuine issue of material fact regarding the alleged offer of $1.2 million.

### 2.   A Reasonable Juror Could Not Conclude that Ms. Gray Ever Extended a $1.8 Million Settlement Offer

The plaintiffs also allege in the alternative that Ms. Gray made a settlement offer of $ 1.8 million.  *See* Carranza Aff. ¶ 8.  In support of this argument, however, the plaintiffs cite to only one document: plaintiff Juanita Carranza's own affidavit.  *See id.*

"[A] party relying on unsupported affidavits cannot survive summary judgment." *McKesson HBOC, Inc. v. Islamic Republic of Iran*, 271 F.3d 1101, 1109 (D.C. Cir. 2001), *vacated in part on other grounds*, 320 F.3d 280 (D.C. Cir. 2003); *see also Arrington*, 473 F.3d at 343 (holding that "[w]hen a plaintiff relies entirely on his own self-serving testimony, which lacks any corroboration and is contradicted by all the available . . . evidence, a court is not obligated to reward the plaintiff with a jury trial").  Summary judgment is appropriate when a plaintiff's claim is supported by only her own self-serving affidavit and is undermined by other evidence.  *See Booth v. District of Columbia*, 701 F. Supp. 2d 73, 73 (D.D.C. 2010); *Kelly v.*

*Hairston*, 605 F. Supp. 2d 175, 182 (D.D.C. 2009); *Mulhern v. Gates*, 525 F. Supp. 2d 174, 186 (D.D.C. 2007).

In her affidavit, Juanita Carranza alleges that Ms. Gray, with a "grin" and a nod of her head, revealed to her that Ms. Gray had sent a $1.8 million settlement offer to the defendant in January 2001, but that for some reason, the defendant failed to relay this offer to the plaintiffs.[8] Carranza Aff. ¶ 8.  There are several reasons why the plaintiff's lone affidavit is insufficient to withstand the defendant's motion for summary judgment.  First, it contains hearsay, which is inadmissible at trial.  FED. R. EVID. 801, 802.  Carranza's affidavit contains hearsay because it includes the statement of another person (Rosalind Gray) in order to prove the truth of the matter asserted therein (that a $1.8 million settlement offer was made).  *See* Fed. R. EVID. 801(c). Courts may not consider those portions of an affidavit that contain inadmissible hearsay when ruling on a motion for summary judgment.  *Catrett v. Johns-Manville Sales Corp.*, 826 F.2d 33, 42 (D.C. Cir. 1987).

Second, there is a conspicuous absence of any evidence in the record that documents the $1.8 million settlement offer.  *See Booth*, 701 F. Supp. 2d at 82 (concluding that the absence of documentary proof indicated that the case was insufficiently meritorious to survive summary judgment).  To illustrate, the lack of evidence supporting the plaintiffs' assertion stands in stark contrast to the evidence available to corroborate existence of the 1998 offer: a copy of the offer, including four pages explaining in detail the responsibilities of the USDA, the plaintiffs, and both parties under its terms.  *See* Pls.' Opp'n Ex. 4.

---

[8]     As the defendant points out in his reply, under the terms of his December 1999 retainer agreement with the plaintiffs, a failure to pass the offer on to his clients would have constituted a puzzling forfeiture of his contingency fee after more than three years of representing the plaintiffs without payment.  The contingency fee would have been equal to 25% of $1.8 million, or $450,000.  Def.'s Mot. Ex. 2; Def.'s Reply 4.

Third, none of the witnesses to Ms. Gray's alleged revelation agree that any such assertions were made. Ms. Gray states, "I do not remember discussing with the Carranzas any potential [OCR] settlements that were contemplated during my tenure as director," and "I do not remember any settlement offer made by the USDA [OCR] that was higher than the one provided in December 1998 and submitted to the Carranzas and their attorney." Def.'s Mot., Ex. 15 ("Gray Aff.") ¶¶ 16-17. Mr. Cotton recalls, moreover, having sat with Ms. Gray during the entire time that she had waited to testify, but he likewise denies that any conversation with Juanita Carranza about potential settlements in 2001 ever took place. Def.'s Mot., Ex. 16 ("Cotton Aff.") ¶¶ 6-8. Finally, Mr. Garsjo indicates that Ms. Gray did discuss settlement negotiations that she had carried out with the defendant over the course of the defendant's representation of the plaintiffs, but confirms that she made no mention of any 2001 settlement offer. Garsjo Aff. ¶¶ 7-8. The plaintiffs are left with only Juanita Carranza's affidavit, which constitutes the type of "self-serving testimony, unsupported by corroborating evidence, and undermined . . . by other credible evidence" that is insufficient to survive a motion to dismiss. *Booth*, 701 F. Supp. 2d at 73.

Fourth, a steady stream of documentary evidence undermines plaintiff Juanita Carranza's account of the facts. Indeed, five contemporaneous documents chronicle the ongoing negotiations between the defendant and Ms. Gray, and each of these documents explicitly refer to the absence of any separate offer from the OCR to the Carranzas. The defendant's January 9, 2001, memorandum to Senator Baucus notes that although Ms. Gray had developed a settlement *proposal*, no *offer* was ever made because the USDA OGC refused to give Ms. Gray sufficient settlement authority to cover both the judgment against the Carranzas and a sufficient cash settlement. Def.'s Mot., Ex. 9. In relevant part, the memorandum reads:

12

> Rosalind Gray, the Director of USDA's [OCR,] recently developed a proposal to settle the Carranzas' civil rights case that, in general terms, would have been acceptable to the Carranzas.  However, officials at the [OGC] have argued that the settlement amount contemplated by OCR was too high, and thus severely limited Gray's settlement authority.
>
> A big portion of the amount Gray would have offered the Carranzas was monies needed to pay off the outstanding judgment the U.S. government has against them. . . .
>
> If this debt were still just owed to USDA, instead of having been converted to a judgment, OCR could have the debt written off and then have plenty of settlement authority (even with OGC's strictures) to make a credible offer to settle with the Carranzas for their damages in the case. However, because it is a judgment, without action by the [USAO Montana], OCR would have to cut a check for the debt on top of what they would settle on the Carranzas for damages, making the total payment way more than OGC is willing to go with at this time (though OCR could live with it).

*Id.*  The memorandum goes on to urge Senator Baucus to assist the defendant in negotiating with the USAO Montana in order to make a settlement feasible.  *Id.*  The January 9, 2001 memorandum thus indicates that the OCR never extended any $1.8 million settlement offer to the plaintiffs.

Similarly, on January 18, 2001, Ms. Gray sent a letter to the parties that explicitly expressed both that she had not made an offer and that she would not be making any offer in the future.  Pls.' Opp'n, Ex. 24.  It states:

> The [USDA OCR] has completed its review of your April 30, 1993, discrimination complaint.  This review is authorized by Section 742 of Public Law 105-277.  Based on this review, we have concluded that the facts of your case was [sic] appropriate for resolution.  However, your attorney advised this office that any offer not sufficient to pay your debt is unacceptable.  Since I am of the opinion that any offer this office would make will not exceed the sum, I will forward your case, as your attorney agreed, for a hearing before an administrative law judge (ALJ).

*Id.* The parties understood Ms. Gray's letter to mean that the "overhanging U.S. Attorney's judgment," which had by then apparently grown to roughly $700,000, was acting as a "road block" to settlement of the Carranzas' claims. Pls.' Opp'n, Exs. 22, 26.

In addition, on January 23, 2001, the defendant sent a memorandum to the offices of the plaintiffs' congressional representatives in order to update them as to the status of several lawsuits involving female farmers in Montana. Def.'s Mot., Ex. 11. In this memorandum, the defendant summarized the negotiation process with the OCR as follows:

> After 4 months of foot-dragging by Rosalind Gray's office, on January 9, I learned that she was prepared to make the Carranzas a substantial offer to settle the case, but that there is a huge judgment against the Carranzas in the Montana Fed[eral C]ourt that would have eaten up all of the money in her offer and then some. In other words, the only offer she could make would not put one red cent in the Carranzas' hands. I asked her not to make such a ludicrous offer, but to let me pursue resolving the judgment debt.

*Id.* According to the defendant, even though Ms. Gray had apparently considered making an offer, she did not actually do so because it would have been less valuable than the outstanding judgment against the plaintiffs.

The defendant also puts forth a February 27, 2001, memorandum to Scot Brown, an Agricultural Loan Officer at the McCone County Federal Credit Union in Montana. This memorandum reiterates that, while the defendant had been continuing negotiations as the OCR transitioned from one presidential administration to the next, no offer had been made:

> The case advanced forward considerably in January. At that time [Ms. Gray] extended to me a proposal to settle the case that would have put on the table an offer of substantial money damages to the Carranzas.
>
> At that point, however, it became clear that an impediment to quick settlement was an outstanding judgment against the Carranzas that is held by the U.S. government in the Montana district court. Since I learned of this impediment, I have been working to get the government to lift its judgment or compromise it out in some way, so as to allow consideration of the January settlement proposal drafted by the [OCR].

Def.'s Mot., Ex. 14.  Thus, this letter suggests that although Ms. Gray proposed to settle the case in a manner that *might have* put a substantial offer on the table, she was ultimately unable to extend an offer that would have disposed of the Carranzas' outstanding debt owed to the USAO Montana.

Finally, the defendant's March 31, 2001, letter to Keith Luse, Staff Director of the Senate Committee on Agriculture, provides a concise summary of the circumstances surrounding the OCR's failure to make the Carranzas an offer in January 2001:

> In early January, Ms. Gray informed me that she was prepared to make the Carranzas a substantial offer to settle their complaint but that there was an outstanding judgment on the Carranzas' [FSA] debt in the Montana Federal District Court she had been unable to do anything about.  This judgment is greater than the amount she was prepared to offer, so she asked me if I wanted her to put it on the table, knowing that if it were accepted all the money would flow to the Government to satisfy the outstanding judgment.  I said no, let me work on getting the outstanding judgment resolved (since the debt it represents was thoroughly tainted by the FSA discrimination).  She told me that there was insufficient time for that given the approaching transition to a new Administration. We left it at that.

Pls.' Opp'n, Ex. 27.  The letter once again indicates that although Ms. Gray was in theory inclined to settle the case, the outstanding judgment impeded the extension of a meaningful settlement offer.

In sum, the defendant has shown that there is no genuine issue of material fact.  First, the defendant's phone log entry does not support the conclusion that any $1.2 million offer was made.  Second, the only evidence that arguably supports the existence of a $ 1.8 million offer is found in the plaintiffs' own affidavit and nowhere else.  The relevant portion of the affidavit is based on hearsay that is impermissible at trial.  In addition, the defendant has provided a large quantity of contrary testimonial and documentary evidence, all of which leads this court to conclude that no reasonable juror could credit the plaintiffs' version of the events.  The

plaintiffs' allegations – in essence, nothing more than a perceived wink and a grin – do not create a "genuine issue of material fact" that is sufficient to survive a motion for summary judgment. *See Anderson*, 477 U.S. at 248.  Consequently, the court grants the defendant's motion.


## IV.  CONCLUSION

For the foregoing reasons, the court grants the defendant's motion for summary judgment.  An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this 31st day of October, 2011.


RICARDO M. URBINA<br>
United States District Judge
